**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
AT NORFOLK**

S.G., an individual,

Plaintiff,

      vs.

COASTAL HOSPITALITY ASSOCIATES, LLC;
MARRIOTT INTERNATIONAL, INC. and
DUNES HOTEL INVESTMENT ASSOCIATES, LLC.

Defendants.

      Case No. 2:25-cv-00274

      **Trafficking Victims Protection
Reauthorization Act 18 U.S.C. § 1595**

---

## FIRST AMENDED COMPLAINT

---

      **COMES NOW** Plaintiff S.G., by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 15(a)(l)(B), hereby submits her First Amended Complaint for damages and avers as follows:

### INTRODUCTION

1. Sex trafficking is a form of modern-day slavery that exists throughout the United States of America and globally. It is furthered by public lodging establishments, including Defendants' branded hotel properties.

2. Defendants profit from sex trafficking by allowing criminals to operate at their branded hotels throughout the United States to include the State of Virginia and have done so for years.

3. Defendants permit criminals to engage in their misconduct openly on Defendants'

1

hotel premises, as the Defendants themselves reap huge profits at the expense of human life, human rights and human dignity.

4. Defendants' business model promotes profits over people and welcomes sex trafficking at their properties by guaranteeing ease of access for buyers, free Wi-Fi and maintaining anonymity, privacy and discretion.

5. Defendants through neglect, direct action and/or deliberate indifference failed to educate their staff about trafficking or enforce anti-trafficking measures as required by Va. Code Ann. Sec. 35.1-15.1 that would require staff to report known or suspected trafficking.

6. Defendants knew or should have known for more than a decade that sex trafficking runs rampant at their branded hotels.

7. Intent on benefiting from the profit created by rooms rented for this explicit and apparent purpose, Defendants repeatedly ignored the open and obvious presence of commercial sex at their properties.

8. Defendants employees were both actively involved and complicit in the trafficking activities that is the subject of this matter.

9. Plaintiff S.G. is a survivor of sex trafficking who brings this action for damages pursuant to the Willams Wilberforce Trafficking Victims Reauthorization Act of 2008 (TVPRA), 18 U.S.C. § 1595.

10. In 2022, Plaintiff S.G., who was a minor, was trafficked for commercial sex in Virginia at Defendants' hotel.

11. Plaintiff S.G. endured coercion, psychological torment and verbal abuse coupled with physical and sexual violence as her trafficker sold her at Defendants' property.

2

Defendants knowingly permitted these commercial sex transactions at their branded hotel.

12. Plaintiff S.G.'s trafficker compelled her obedience by maintaining total control over her day-to-day activities, social media presence, email and phone and by forcing her to consume alcohol and drugs to ensure she remained docile. Plaintiff S.G.'s trafficker also forced her to do his bidding by means of hitting, slapping, choking, beating, manipulating, humiliating, degrading, exhausting, isolating, forcing her into debt, threats to her person, to her family and other methods to enforce her compliance.

13. Plaintiff S.G's trafficker also worked in concert with employees of the subject property in order to accomplish the human trafficking of the Plaintiff.

14. Buyers arrived day and night at Defendants' hotel, entering rooms they either did not rent or did not rent for the purpose of an overnight stay. One by one, dozens to hundreds of unrelated buyers used Defendants' hotel rooms and services to sexually exploit, abuse, and rape Plaintiff S.G.

15. This illicit enterprise continued with Defendants' actual and/or constructive knowledge. Defendants systematically siphoned profits from the sale of victims trafficked at their hotels, including Plaintiff S.G., by leaving permissive policies and brand standards in place, rather than taking steps to ensure hotel staff could spot, report, and prevent trafficking at Defendants' branded hotel.

16. As a direct and proximate result of Defendants' collective failure to interdict commercial sex trafficking at their properties, Plaintiff S.G. was trafficked for sex at Defendants' branded hotel with their actual or constructive knowledge.

3

17. Plaintiff S.G. brings this action for damages pursuant to the TVPRA, 18 U.S.C. § 1595, against the Defendants, each of which enabled and financially benefitted from their knowing participation in illicit sex trafficking business ventures, in violation of 18 U.S.C. § 1591(a).

## **PARTIES**

18. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1-17 with the same force and effect as though fully set forth herein.

19. Plaintiff S.G. (hereinafter "Plaintiff") is a citizen of the United States of America, is a citizen and resident of the State of Florida.

   a. Plaintiff is a "victim" of sex trafficking within the meaning of 22 U.S.C. § 7102(17), 18 U.S.C. §§ 1591(a), and 1595(a), and a survivor of a "severe form of trafficking" within the meaning of 22 U.S.C. § 7102(16).

   b. Due to the sensitive nature of Plaintiff's allegations, she requests this Court permit her to proceed under a pseudonym and files a Motion for Protective Order pursuant to Federal Rule of Civil Procedure 26(c) herewith to ensure Defendants keep her identity confidential during the pendency of this lawsuit and thereafter.

   c. The Federal Rules of Civil Procedure require pleadings to state the names of all parties. However, there are judicially recognized exceptions when the issues involved are of a sensitive and highly personal nature. For good cause the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.

d. Here, pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of highly personal and stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, potential employers, and community, if her identity is revealed in the public record. Further, Plaintiff fears for her safety and well-being if her name is not sealed and her trafficker can find her.

e. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating her claims once the parties have entered a protective order. Plaintiff simply seeks redaction of her personally identifying information from the public record and assurances that Defendants will not use or publish her identity in a manner that will compromise her personal life or future employment.

f. Plaintiff should not be compelled to disclose her identity to maintain her privacy and safety. Her privacy interest substantially outweighs the customary practice of judicial openness, and there is no prejudice to Defendants.

20. Defendant Coastal Hospitality Associates, LLC ("Coastal") offers public lodging services directly and through its affiliates, subsidiaries, and franchisees. They own, supervise, staff, train and/or operate the Spring Hill Suites by Marriott ("branded hotel/s") located at 901 Atlantic Ave., Virginia Beach, VA 23451 that is the subject of this complaint. It is a Virginia corporation with a principal office located at 3612 Atlantic Ave. Virginia Beach, VA 23451 and may be served by its registered agent, Robert E. Farmer III, 2101 Parks Ave., Suite 700, Virginia Beach, VA 23451.

a. The Spring Hill Suites by Marriott Virginia Beach Oceanfront is a Marriott brand property.

b. As an integrated enterprise and/or joint employer, Defendant Coastal Hospitality Associates, LLC and Marriott are separately and jointly responsible for compliance with all applicable laws.

c. As an integrated enterprise and/or joint employer, Defendant Coastal Hospitality Associates, LLC and Marriott are jointly responsible for compliance with all applicable laws.

d. As an integrated enterprise and/or joint employer, Defendant Coastal Hospitality Associates, LLC and Marriott are jointly and severally liable for any damages caused by their employees.

e. Upon information and belief, Coastal Hospitality Associates, LLC controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, and/or other hotel brand related policies published and communicated via property management system with back-end management by Coastal Hospitality Associates, LLC, Wi-Fi qualification and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Coastal Hospitality Associates, LLC hotel where Plaintiff was

Trafficked.

    f.  Through its relationship with the staff at the Spring Hill Suites by Marriott where Plaintiff was trafficked and the perpetrator who trafficked Plaintiff, Coastal Hospitality Associates, LLC  knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to be engaged in sex trafficking and their employees engaged in directly facilitating the trafficking activities that took place.

    g.  Coastal Hospitality Associates, LLC benefited financially from renting the rooms where Plaintiff was trafficked for sex.

21. Defendant Marriott International, Inc. ("Marriott") is one of the largest hotel franchising companies in the world with more than 30 leading brands over 9,100 branded properties across 142 countries.[1]  Marriott offers public lodging services directly and through its affiliates, subsidiaries, and franchisees.

    a.  Defendant Marriott is a is a Delaware corporation with its principal place of business located at 7750 Wisconsin Ave, Bethesda, MD, 20814.  It can be served by its registered agent, Corporation Service Company, at 100 Shockoe Slip Fl 2, Richmond, VA, 23219-4100.

    b.  Marriott owns, supervises, manages, controls, and/or operates the Spring Hill Suites by Marriott located at 901 Atlantic Ave., Virginia Beach, VA 23451 where the Plaintiff was trafficked.

    c.  The Spring Hill Suites by Marriott is a Spring Hill Suites branded property,

---

[1] https://www.marriott.com/marriott/aboutmarriott.mi

and Marriott International, Inc. in turn owns the Spring Hill Suites brand.

d.   Marriott is the principal in an agency relationship with the Spring Hill Suites. In addition, Marriott's lability under TVPRA section 1595, Marriott is vicariously liable for the acts and/or omissions of the staff at the Spring Hill Suites and all its franchisee hotels.

e.   The Spring Hill Suites where Plaintiff was trafficked has apparent agency for Marriott so as to establish vicarious liability under Virginia law, in addition to an actual agency relationship.

f.   Marriott has ratified the actions and inactions of the Spring Hill Suites.

g.   Marriott exercises day-to-day control over the Spring Hill Suites through its brand standards and retains control over the Spring Hill Suites under the terms of its franchise agreements.

h.   As the principal and as a hotel operator, Marriott controls the training and policies for its branded hotels, including the Spring Hill Suites where Plaintiff was trafficked. Marriott represents that it considers guest safety and security important and requires the branded hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.

i.   Upon information and belief, Marriott also controls a uniform and required reservation and marketing system, credit processing system, and training and policy on brand standards, including policies on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or

8

other hotel brand related policies published and communicated via property management systems with back-end management by Marriott, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Spring Hill Suites where Plaintiff was trafficked.

j. Through Marriott's relationship with the staff at the Spring Hill Suites where Plaintiff was trafficked and where Plaintiff's traffickers were guests or visitors, Marriott knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known to be engaged in sex trafficking through royalty payments, licensing fees, and percentages of the gross room revenue which Marriott is entitled to under its franchise agreements.

k. Marriott benefits financially by receiving a percentage of the gross room revenue from the money generated by the operations of its hotels, including through a percentage of the revenue generated at the Spring Hill Suites from the rates charged on the rooms in which Plaintiff was trafficked for sex.

l. Marriott regularly conducts business in the State of Virignia, derives substantial revenue from services rendered in Virginia, including through the operation of numerous hotels in Virginia, including the Spring Hill Suites has caused indivisible injuries to Plaintiff in Virginia, and has

9

profited from an illegal sex trafficking venture at the Spring Hill Suites.

22. Defendant Dunes Hotel Investment Associates, LLC ("Dunes") offers public lodging services directly and through its affiliates, subsidiaries, and franchisees. They own, supervise, and/or operate the Spring Hill Suites by Marriott located at 901 Atlantic Ave., Virginia Beach, VA 23451 that is the subject of this complaint. It is a Virginia corporation with a principal office located at 3612 Atlantic Ave. Virginia Beach, VA 23451 and may be served by its registered agent, Robert E. Farmer III, 2101 Parks Ave., Suite 700, Virginia Beach, VA 23451.

   a. The Spring Hill Suites by Marriott Virginia Beach Oceanfront is a Marriott brand property.

   b. As an integrated enterprise and/or joint employer, Defendant Dunes and Marriott are separately and jointly responsible for compliance with all applicable laws.

   c. As an integrated enterprise and/or joint employer, Defendant Dunes and Marriott are jointly responsible for compliance with all applicable laws.

   d. As an integrated enterprise and/or joint employer, Defendant Dunes and Marriott are jointly and severally liable for any damages caused by their employees.

   e. Upon information and belief, Defendant Dunes controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, and/or other hotel brand related policies published

and communicated via property management system with back-end management by Dunes, Wi-Fi qualification and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Dunes hotel where Plaintiff was Trafficked.

f.  Through its relationship with the staff at the Spring Hill Suites by Marriott where Plaintiff was trafficked and the perpetrator who trafficked Plaintiff, Dunes  knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to be engaged in sex trafficking. Dunes benefited financially from renting the rooms where Plaintiff was trafficked for sex.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331because this action arises under the Constitution, laws or treatises of the United States and this Court has supplemental jurisdiction over Plaintiff's claims that do not arise under federal law because each claim is "so related to claims in the action within this Court's original jurisdiction that they form part of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

24. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this judicial district.

11

## FACTUAL ALLEGATIONS

25. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1-24 with the same force and effect as though fully set forth herein.

### A. HUMAN TRAFFICKING IS A $150 BILLION DOLLAR BUSINESS INEXTRICABLY LINKED TO THE DEFENDANTS & THE HOSPITALITY INDUSTRY

26.  Human trafficking is the world's second fastest growing crimes.[2]

27. The worldwide estimated total of illegal profits obtained from the use of forced labor is $150.2 billion per year.[3]

28. According to the 2019 Trafficking in Person Report, approximately 77% of traffickers exploit people residing in their location of residence.[4]

29. Within the Commonwealth of Virginia, we have been seeing this to be true through cases that are being prosecuted as well as through anecdotal information from service providers.[5]

30. The largest share of total illegal profits is from forced commercial sexual exploitation.[6]

31. Although forced commercial sexual exploitation accounts for only about one quarter of all people in privately imposed forced labour, it accounts for 73 per cent of total illegal profits from forced labour (figure 6a). Of the US $236.4 billion was

---

[2] https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/victims/state-human-trafficking-virginia.pdf, page 1.

[3] Id.

[4] Id.

[5] Id.

[6] https://www.ilo.org/sites/default/files/2024-10/Profits%20and%20poverty%20-%20The%20economics%20of%20forced%20labour_WEB_20241017.pdf, page 22.

made from the use of forced labour, almost US$173 billion was generated in forced commercial sexual exploitation.[7]

32. Profits from forced commercial sexual exploitation are substantial across all regions. As reported in figure 7, annual total illegal profits from forced commercial sexual exploitation range from US$58.6 billion in Europe and Central Asia, US$48.4 billion in Asia and the Pacific, US$34.9 billion in Americas, US$16.1 billion in Africa and US$14.6 billion in the Arab States.[8]

33. An estimated 6.3 million people were in situations of forced commercial sexual exploitation on any given day in 2021. Gender is a key determining factor: nearly four out of every five (78 per cent) people trapped in these situations are girls or women. Children (boys and girls) account for one in four (27 per cent) of the total cases.[9]

34. Forced labour touches virtually all parts of the private economy. Among cases of forced labour in the private economy where the type of work was known, the four broad sectors accounting for the majority of total forced labour (89 per cent) are industry, services, agriculture, and domestic work.[10]

35. The services sector encompasses activities related to wholesale and trade, accommodation and food service activities, art and entertainment, personal services, administrative and support services, education, health and social services, and transport and storage.[11]

---

[7] Id.
[8] Id.
[9] Id. at 13.
[10] Id. at 11.
[11] Id.

36. Sex traffickers, or "pimps," use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

37. Criminal traffickers could not succeed in this hugely profitable industry alone. Experts agree that human trafficking is increasingly less underground, and traffickers routinely interact and utilize commercial businesses for their criminal endeavors. "Traffickers use banks to deposit and launder their earnings; they use planes, buses and taxi services to transport their victims; they book hotel rooms integral also to sex trafficking; and, they are active users of social media platforms to recruit and advertise the services of their victims."[17]  The private sector's involvement in the sex trafficking trade is undeniable, and companies have a responsibility to address their role in it with active and effective measures.[12]

38. In particular, the hospitality industry and the Defendants' hotels are at the center of the sex trafficking trade. News outlets, nonprofits, and other interested stakeholders have confirmed the "obvious nexus" between human trafficking and hotels' crucial role as the venue for selling commercial sex.[13]

39. According to National Human Trafficking Hotline statistics, hotels are the top-reported venue where sex trafficking occurs, surpassing even commercial brothels alike frequently use hotel rooms to exploit victims because hotels offer

---

[12] https://www.forbes.com/sites/carmenniethammer/2020/02/02/cracking-the-150-billion-business-of-human-trafficking/

[13] Brittany Anthony, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking,* Hotels and Motels, POLARIS 16-23 (Jul. 2018) https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf; *see also Hotels & Motels Recommendations*, POLARIS https://polarisproject.org/hotels-motels-recommendations.

anonymity and non-traceability which make them ideal venues for crime, and sex trafficking specifically.[14]

40. Hotels are uniquely vulnerable to trafficking due to their transient nature and the anonymity provided to guests.[15]

41. Hotels are a crucial piece of the infrastructure necessary to facilitate human trafficking in escort services. In fact, of the 3,596 cases of human trafficking reported to the National Hotline to be occurring at a hotel, 2,920 or 81 percent of those were used within the escort services business model.[16]

42. Escort services using hotels primarily function one of two ways: an "in-call" model or an "out-call" model. In-calls are when the trafficker or victim books the hotel room where the victim is usually confined while buyers cycle in and out.[17]

43. Contrary to popular misconception, trafficking does not only take place in cheap hotels or motels with sub-par accommodations. Instead, traffickers running in-call escort businesses look for a range of factors including convenient locations, buyer comfort, price, a hotel's policies, procedures, and infrastructure, and whether the hotel is prone to law enforcement monitoring. As a result of these needs, trafficking may often occur at hotel chain franchises that offer a good balance of quality and price while giving buyers a sense of anonymity and safety.[18]

44. An in-call trafficking business model can provide hotel staff with more

---

[14] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, Cornell University, SCHOOL OF HOTEL ADMINISTRATION (2017) at 1.

[15] https://www.navex.com/en-us/blog/article/prevent-human-trafficking-in-the-hospitality-industry-the-role-of-whistleblowing-and-incident-management-solutions/

[16] *Hotels Initiative*, THE POLARIS PROJECT https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf at 19.

[17] Id.

[18] Id.

15

opportunities for identification since the victim and trafficker are typically both on site for an extended period of time (as opposed to one night); (such as in this subject case).[19]

45. In these cases, there is typically a reservation and payment footprint associated with the victim or trafficker, and there is usually more foot traffic on the property from buyers; (such as in the present case).[20]

46. Due to Defendants' individual and collective failure to embrace anti-trafficking policies, practices, and training, children and other vulnerable persons are trafficked for sex in hotels throughout the United States and worldwide.

## B. DEFENDANTS KNOWINGLY PROFIT FROM SEX TRAFFICKING WHILE MAINTAINING THEIR PUBLIC IMAGE

47. Defendants have long understood their roles and responsibilities for the sex trafficking trade.

48. Global campaigns took initiative against human trafficking in the hotel industry and the lack of internal policies as early as 1997 with the United Nations Blue Heart Campaign.[21]

49. To assist Defendants and other corporate brands in combatting sex trafficking within their hospitality companies, ECPAT developed and launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism ("The Code") in 1996 and ECPAT-USA in the United States in 2004.[22]

---

[19] Id.
[20] Id.
[21] *Have a Heart*, UNITED NATIONS OFFICE ON DRUGS AND CRIME, https://unis.unvienna.org/unis/en/campaigns/2023/blue-heart-campaign.html.
[22] THE CODE.ORG, What is the Code?,,https://thecode.org/about/

50. ECPAT-USA also identifies hotel-specific best practices for preventing sex trafficking including but not limited to:

a.  Developing a formal policy against trafficking;
b.  Developing a protocol for response;
c.  Conducting periodic training on indicators;
d.  Not renting by the hour;
e.  Not permitting cash payments;
f.  Blocking "internet access to popular websites for online sex ads";
g.  Monitoring "online sex ads such as Craigslist and Backpage for your hotel name and pictures of your rooms and guests";
h.  Changing wi-fi passwords in rooms and cafes regularly;
i.  Requiring all visitors be logged, including guest name, visitor name, arrival time,departure time, and room number;
j.  Actively greeting and speaking with all visitors arriving at night;
k.  Watching for a trends of visitors to the same room; and
l.  Being aware of rooms with excess condoms, lubricants, and towels and reporting these indicators to management.[23]

51. The Defendants that are signatories to ECPAT only pay lip service to its goals, while failing to implement its most effective guidance.

52. Defendants continue to profit from the sex trafficking of Plaintiff, and other survivors like her.

53. Defendants have flagrantly contravened the spirit of ECPAT by failing to seriously implement its most effective guidance.

54. Defendants have refused to implement effective anti-trafficking measures and training, in order to preserve profits and cut costs.

55. Defendants agree human trafficking is a problem but never admit that it is a problem at *their* branded hotels.

56. Defendants have long engaged in a coordinated campaign to avoid bad publicity while preserving the profits they derive from providing accommodation to human

---

[23] ECPAT-USA Anti-Trafficking Hotel Checklist://aahoa.com/public/storage/2023/11/23/cms/ecpat-usa-antitraffickinghotelchecklist.pdf

traffickers and buyers, which ensures Defendants remain as complacent as their peers in facilitating sex trafficking at their branded hotels.

## C. THE SEX TRAFFICKING OF PLAINTIFF AT DEFENDANTS' BRANDED HOTEL

57. Plaintiff's trafficker sold her at the age of 16 for commercial sex at Defendants' hotels with Defendants' actual or constructive knowledge. Plaintiff suffered rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at Defendants' branded hotels.

58. Defendants' front desk employee knew Plaintiff's trafficker.

59. Defendants' front desk employee assisted Plaintiff's trafficker with illegally checking into the hotel.

60. Defendants' front desk employee deliberately and knowingly checked in Plaintiff's trafficker under an alias name so that his real identity could not be tracked. This is confirmed by a folio from the Defendants and confirmed by the police that no ID recovered at the time of the trafficker's arrest matched the name to check in. This contravenes the Defendants' own policies and demonstrates the facilitation of trafficking.

61. The Defendants' front desk employee recorded the room that Plaintiff was in as only one occupant despite the minor child, the Plaintiff, being present and even discounted the room under a military discount despite there being no basis for that discount.

62. Defendants had two other employees, one male and one female who assisted Plaintiff's trafficker with his activities and facilitated his stay and conduct at the subject property.

63. Defendants' employees met with Plaintiff's trafficker and the Plaintiff before they

18

checked in.

64. Defendants' employees were each paid $200 by Plaintiff's trafficker for their assistance as witnessed by the Plaintiff.

65. Defendants' male employee was seen at the hotel by the Plaintiff during her stay at the hotel and when he engaged in sex with her at the subject property.

66. Plaintiff's trafficker used force and threats to compel her into sexual labor at the Defendants' branded hotel.

67. Plaintiff's trafficker controlled her every action.

68. Plaintiff was trafficked continuously at Defendants' branded hotel from May1, 2022- May 19, 2022, when she was rescued by a law enforcement raid.

69. Plaintiff was drugged continuously to stay awake and forced to remain awake to have sex with a continuous stream of men for three days without sleep at Defendant's branded hotel.

70. Plaintiff was required to have sex for payment with hundreds of buyers at Defendants' branded hotel.

71. Plaintiff was sold by her trafficker for sex to anywhere between 30-50 buyers per night at Defendants' branded hotel.

72. Plaintiff's trafficker used Defendants' Wi-Fi to post advertisements and talk to Plaintiff's buyers.

73. Defendants' employees deliberately hid and/or ignored the internet data which showed that their Wi-Fi was being accessed for illegal activities.

74. Defendants' deliberately did not put in place a fire wall to prevent access to web-sites used for human trafficking.

19

75. Plaintiff's buyers entering Defendants' branded hotels were non-paying guests and left shortly after they arrived at Defendants' branded hotel.

76. Plaintiff's trafficker would wait in the lobby or the parking lot while Plaintiff was sex trafficked at Defendants' branded hotels.

77. The foot traffic to the rooms where Plaintiff was harbored was constant and obvious at Defendants' branded hotel and ignored by Defendants' employees.

78. Plaintiff encountered the same hotel staff while she was trafficked for sex at Defendants' branded hotel.

79. Plaintiff even sought help from the front desk twice over the course of two weeks, yet hotel staff ignored the signs of her abuse. The staff ignored the fact that she had bruising and that she was a minor. When she appealed to the front desk for help, she was deliberately ignored and allowed Plaintiff's trafficker to come and retrieve her. Defendants' branded hotels' staff did nothing to report or avert the suffering she endured.

80. During the entire stay hotel staff were prohibited from entering the Plaintiff's room with a "do not disturb" sign displayed. This activity is a critical sign of human trafficking and is a known technique to the Defendants'.

81. The Defendants' were mandated by their own rules, regulations, policies and industry standards to enter the room by management when any room displays a "do not disturb" sign for more than 48 hours.

82. Defendants' employees and managements deliberately did not enter the room and facilitated the human trafficking taking place.

83. Further a hotel cleaning staff, knowing that the room had not been cleaned asked the

20

Plaintiff if she needed additional clean towels, seeing a minor in a prohibited room and took no action regarding the situation.

84. The room that the Plaintiff was trafficked in was deliberately chosen by the Plaintiff's trafficker and facilitated by the front desk clerk of the Defendants.

85. The Plaintiff's trafficker rented multiple rooms for different durations at the time that the Plaintiff was a captive at the subject property, under false identities and this was known to Defendants' employees who assisted in the activity.

86. Other girls were trafficked at the subject property at the same time the Plaintiff was being trafficked, the names of which will not be published in this document.

87. Defendants' employees knew that multiple girls were being kept at the hotel for the purpose of human trafficking by Plaintiff's trafficker.

88. Defendants' front desk staff and the two paid employees with knowledge assisted and participated by allowing Plaintiff's trafficker to operate freely in the hotel and to even greet men in the lobby to direct them where to go so that he would have the Plaintiff "on display" when they entered the room.

89. Plaintiff's trafficker followed a repetitive process which, alongside several other red flags and direct employee interactions and conduct which alerted or should have alerted Defendants to Plaintiff's trafficking and other girls trafficking at their branded hotel, including but not limited to:

   a. Paying for room with a credit card not in his name;

   b. Paying for extended stays on a day-to-day basis;

   c. Requesting special rooms, including room in a more secluded area;

   d. Requesting a room overlooking the parking lot;

e.  Plaintiff's trafficker's solicitation of buyers in and around Defendants' branded hotel, including the lobby and parking lot;

f.  Plaintiff and Plaintiff's trafficker's behavior, including the trafficker's complete control over Plaintiff;

g.  Plaintiff's physical appearance including being malnourished, drugged and clothed with inappropriate attire for a minor;

h.  Excessive requests for sheets, cleaning supplies, and room service;

i.  Using Defendants' Wi-Fi to post advertisements for commercial sex;

j.  Continuous processions of unregistered buyers entering and exiting the room for over two weeks straight upwards of 50 men a day.

k.  Indicia of commercial sex within the room, including an inordinate number of used condoms, lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels;

l.  Obvious signs of illegal drug use;

m.  The prohibition of entry into the room with a do not disturb sign;

n.  Audible please to branded hotel staff for help;

o.  Direct employee encounters of Plaintiff's suffering in and around Defendants' branded hotel premises.

90. Despite the obvious signs of Plaintiff's sex trafficking, which were or should have been observed by Defendants' staff and particularly management, Plaintiff's trafficker was permitted to continue selling Plaintiff for the commercial sex at Defendants' branded hotel.  Plaintiff received no assistance from any of Defendants' staff during her captivity, and Defendants continued to profit from

the room rentals where she was trafficked.

91. The trafficking at Defendants' branded hotel was obvious and observed by hotel staff and guests. In order to continue reaping the profits of Plaintiff's exploitation, Defendants chose not to implement and enforce effective anti-trafficking measures to protect Plaintiff, and others like her, from the obvious criminal activity occurring at their branded hotel.

92. Had Defendants not harbored known and suspected human traffickers in exchange for financial gain, Plaintiff's trafficker could not have successfully arranged for her to be continually sold for sex at Defendants' branded hotel.

93. Had Defendants not had business models which permitted, facilitated, and encouraged ongoing human trafficking at their branded hotel, Plaintiff would not have been trafficked at Defendants' branded hotel. The open and obvious signs of Plaintiff's sex trafficking would and should have resulted in Plaintiff's trafficking being reported, prevention of further room rentals to her trafficker, and an earlier end to Plaintiff's exploitation at Defendants' branded hotel.

94. Similarly, had Defendants' proclaimed anti-trafficking efforts in training, policies, and procedures at their branded hotel in fact been implemented, it would have been impossible for Plaintiff to be repeatedly exploited.

95. Prior to, during, and following the incidents described herein, Defendants had actual and/or constructive knowledge of the rampant criminal activity occurring at their branded hotels, including trafficking, drug dealing, and general safety concerns observable via video surveillance of their hotels and oral or written complaints regarding the same. Defendants chose to prioritize profits over people

and elected not to take any action to curtail sex trafficking at their branded hotels.

96. The impact of Plaintiff's trafficking has emotionally and physically injured Plaintiff, who suffers immensely as a result of the horrors inflicted upon her at Defendants' branded hotel.

**D. DEFENDANTS ARE DIRECTLY LIABLE FOR THEIR ROLE IN PERMITTING AND FACILITATING PLAINTIFF'S TRAFFICKING AT DEFENDANTS' BRANDED HOTELS**

97. Defendants have been on notice of repeated incidents of sex trafficking occurring at their branded hotels since as early as 2006 to include in the Virginia Beach Oceanfront yet fail, and persist in failing, to fulfill their responsibility to combat such criminality or refuse its benefits.

98. Defendants knowingly participated in commercial sex trafficking business ventures at their branded hotels, including those where Plaintiff was trafficked, by receiving money they knew or should have known was derived from Plaintiff's sex trafficking.  There was an ongoing business relationship between Defendants, their branded hotel, and Plaintiff's trafficker which was aligned with Defendants' common hotel operating enterprises.

99. Defendants knowingly benefitted from the profits derived from renting rooms to Plaintiff's trafficker.

100.     Defendants' employees working at their branded hotel observed the obvious indicia of Plaintiff's trafficking and thus facilitated her trafficking at Defendants' branded hotel.

101.     Defendants' employees engaged in the facilitation of Plaintiff's trafficking at the subject property.

102.    Defendants also knew or should have known of Plaintiff's trafficking at their branded hotel through their centralized control and monitoring of their branded hotel, the decades of research and resources provided to Defendants to combat sex trafficking, and the supposed anti-trafficking measures Defendants claimed to have implemented at their branded hotels.

103.    Defendants failed to train, implement, and enforce anti-trafficking policies, procedures, and training to protect Plaintiff, and others like her, from being repeatedly sex trafficked at their branded hotels.[24]

104.    Defendants could and should have exercised additional control over their branded hotels to address the known sex trafficking at their properties by:

a. Distributing information to assist branded hotel staff in identifying human trafficking;

b. Mandating a process for escalating suspected human trafficking within their organizations;

c. Providing checklists, escalation protocols, and information on human trafficking to branded hotel staff;

d. Requiring branded hotel staff to attend trainings related to human trafficking;

e. Mandating new hire orientation on human rights and corporate responsibility;

---

[24] The failure to implement policies sufficient to combat a known problem in a hotel operation, like sex trafficking, supports a claim of negligence or willful blindness. *See J. B. v. G6 Hosp., LLC*, No.19-CV-07848-HSG, 2021 WL 4079207, at *15 (N.D. Cal. Sept. 8, 2021) (citing cases); *see also Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (E.D. Tenn. May 29, 2007).

f. Mandating training and education to branded hotel staff through webinars, seminars, conferences, and online portals;

g. Developing and holding ongoing training sessions on human trafficking; and

h. Tracking performance indicators and key metrics on human trafficking prevention at branded hotels.

105. Despite having actual and/or constructive knowledge of the extensive commercial sex trafficking occurring at its branded hotels, Defendants repeatedly failed to stop or adequately address Plaintiff's sex trafficking at their branded property.

## E. MARRRIOTT IS VICARIOUSLY LIABLE FOR PLAINTIFF'S TRAFFICKING AT THEIR BRANDED HOTELS

106. To the extent that the collective Defendants jointly own, operate, manage, supervise, employee and train employees, Marriott is vicariously liable for the actions and inactions of these franchisees and respective employees, managers and directors.

107. Marriott's branded hotel acts as Marriott's agents.

108. Not only did Marriott lend its names and marks to their branded hotel, including Defendants' branded hotel, but Marriot also retained centralized control over the daily operations of their branded hotel, including marketing, reservation, vendor, technology, sales and revenue management.

109. The average consumer does not see this relationship. To a customer, the franchisee hotel operator and contracted entities are the same as Defendant franchisor. Marriott provides signage in and around their hotel properties that

assures customers that when they check into Marriott's branded hotels, customers can expect accommodations that conform to Marriott's brand standards. This notion is reinforced at every turn: Marriott's brand mark appears emblazoned on everything from the pens on bedside tables to staff uniforms at the front desk.

110.     In addition to brand recognition and expectations, Marriott and MHS provides a marketing organization and hotel listings in the global distribution systems and other online travel agency databases. Marriott and MHS also provides their branded hotels with access to its brand-wide central reservation systems, 1-800 phone numbers, revenue management tools, world-class loyalty programs, and websites. Thus, booking and room reservations are controlled by Marriott and MHS. Marriott and MHS see booking and reservation trends at all of their branded hotels.

111.     Marriott also requires their branded hotels to use Marriott's property management systems, implemented by MHS, which are linked to Marriott's corporate networks and data centers, for processing reservations and credit card transactions.

112.     Franchisee branded hotels typically pay around 10% of their total revenue back to the Franchisor and are required to develop and maintain hotel properties in accordance with Marriott's standards as they are laid out in franchisee agreements.

113.     Per the contract or franchise agreements, Marriott may enforce their standards through periodic inspections and even franchise termination if their branded hotels are found to be out of compliance. However, Marriott is loath

27

to terminate their franchise agreements with noncompliant hotels because they would miss out on the revenue the franchisees or branded hotels generate, and so it happens very rarely.

114.    Marriott and MHS enforces their own brand standards.

115.    Marriott and MHS exercises control over their branded hotels' day-to-day operations and set their branded hotel's policies and procedures on human trafficking.

116.    Marriott exercises more control over their branded hotels than just the hotels' daily operations.

117.    Marriott also gathers data from their branded hotels' customers, including names, payment information, reservation histories, browsing data, and other details associated with customers' stays for promotional and guest safety reasons.

118.    Marriott and its branded hotels exhibit a significant degree of interrelated, intermingled, and unified operation, which demonstrates the agency relationship between Marriott and their franchisees and/or branded hotels.

119.    Under federal labor regulations, Marriott is considered joint employers of the employees at their branded hotels. Further, it is a standard practice in the hospitality industry for parent companies to exercise significant control over the employment decisions at their branded hotels. Upon information and belief, Marriott and MHS promulgates policies, procedures, and standards governing the hiring, training, retention, and advancement of their branded hotel employees and set rates of pay.

120.    Marriott's branded hotels act as their agents.

28

121.    These agency relationships were created through Marriott's exercise of an ongoing and systemic right of control over their branded hotels' operations beyond that which is necessary to maintain brand standards, including the means and methods of how the branded hotels conducted daily business through the following actions:

a. Hosting online bookings on Marriott's domains;

b. Regulating the rates for room rentals at branded hotels;

c. Fixing other prices at branded hotels, such as fees, incidentals, and food prices;

d. Sharing profits;

e. Requiring branded hotels to use Marriott and MHS property management systems;

f. Requiring branded hotels to use Marriott and MHS payment processing systems;

g. Requiring branded hotels to use only specific and approved vendors;

h. Requiring branded hotels to use Marriott and MHS customer rewards program;

i. Requiring branded hotels to carry internet services or other requirements for Wi-Fi access, filtering, and cybersecurity measures which gives Marriott the ability to access, monitor, and harvest that internet data;

j. Requiring branded hotels to install Marriott's data transport systems to share data with Marriott;

k. Mandating insurance coverage requirements for branded hotels;

29

l. Controlling customer review and response platforms;

m. Gathering reports of data generated by branded hotels, including reservation, payment, and occupancy information through Marriott's centralized systems;

n. Requiring branded hotels to keep audit reports and other records of hotel operations;

o. Setting employee wages at Marriott's branded hotels;

p. Making employment decisions at branded hotels, including hiring, firing, and promotions;

q. Providing standardized training methods, education, and orientation materials for branded hotel employees, including but not limited to, webinars, seminars, conferences, and online portals;

r. Advertising for branded hotels, including new property openings and employment;

s. Providing marketing requirements and standardized marketing services for branded hotels;

t. Providing the software, hardware, and platforms used by branded hotels in daily operations or to report suspicious activity;

u. Providing IT support for Marriott's required systems;

v. Building and maintaining the structure of branded hotels in the manner specified by Marriott;

w. Requiring branded hotels to make modifications at Marriott's request and to refrain from making substantial changes to the branded hotels without

Marriott's permission;

x.  Conducting and authorizing regular inspections of branded hotels and operations by the local owners for compliance with contract terms and Marriott's rules and regulations;

y.  Mandating standardized or strict rules of operation;

z.  Developing uniform operating policies, procedures, and standards for Marriott's branded hotels, including policies relating to security and guest safety, human rights, ethics, corporate governance, compliance with the law, and the prevention of commercial sex trafficking at the branded hotels, including risk management processes to identify, prevent, and mitigate risks for commercial sex trafficking; and Other actions that deprived Marriott branded hotels of independence.

122. An apparent agency relationship also existed between all Defendants and their branded hotel because Defendants hold their branded hotels out to the public as possessing authority to act on Marriott's behalf.

123. Marriott is vicariously liable for the conduct of their branded hotels and all other Defendants because traffickers, including Plaintiff's traffickers, relied on Marriott's ineffective and/or unenforced anti-trafficking measures when choosing where to traffic their victims.

124. Collectively Defendants' branded hotel' employees observed obvious signs of sex trafficking and/or were aware of Plaintiff's plight, yet failed to identify, protect, or prevent her from further victimization at Defendants' branded hotels. Defendants' policies and procedures failed to prevent Plaintiff's

trafficking or were not properly implemented due to lack of training, education, and/or enforcement by Defendants.

125.    Had Defendants implemented adequate anti-sex trafficking measures, their "branded hotels' employees would have been aware of Plaintiff's trafficking would have reported such activity directly to Defendants.

126.    Defendants were not only aware of Plaintiff's trafficking, but also of their own failure to train their employees and institute changes that would have protected Plaintiff and prevented trafficking at their branded hotel.

127.    Given Marriott's public statements on behalf of their branded hotel about sex trafficking, and the control Marriott exerts over their branded hotels, Marriott breached certain duties they owed to the victims of human trafficking at its branded hotel, including Plaintiff, in the following ways, including but not limited to:

    a.   Failing to distribute information to assist employees in identifying human trafficking;

    b.   Failing to mandate processes for escalating human trafficking concerns within their organizations;

    c.   Failing to provide checklists, escalation protocols and information to property management staff;

    d.   Failing to require employees to attend trainings related to human trafficking;

    e.   Failing to mandate new hire orientation on human rights and corporate responsibility;

    f.   Failing to mandate training and education to their branded hotels through webinars, seminars, conferences, and online portals;

32

g.  Failing to develop and hold ongoing training sessions on human trafficking;

h.  Failing to evaluate their reservation, data, and other centralized systems  for indicators of sex trafficking;

i.  Failing to track performance indicators and key metrics on human trafficking prevention;

j.  Failing to evaluate implemented anti-trafficking measures for effectiveness  and make changes where necessary; Failing to ban cash or prepaid credit cards as payment for room rentals;

k.  Failing to track performance indicators and key metrics on human trafficking prevention; and

l.  Failing to filter, monitor, and block classified advertising websites known  for commercial sex from being accessed via their Wi-Fi networks and internet service providers.

128.    Defendants chose profits from Plaintiff's trafficking at their branded hotel  over implementation or enforcement of anti-trafficking policies, procedures, and training.

129.    Defendants knew or should have known that these profits were derived from the criminal sex trafficking of Plaintiff at their branded hotel.

130.    Defendants are aware that human trafficking occurs at their branded hotel and know that hey facilitate rather than prevent sex trafficking.

131.    Defendants, despite having actual and/or constructive knowledge of sex  trafficking occurring at their branded hotel, failed to prevent or adequately address these crimes.

132.    Had Defendants acted in earnest and implemented anti-trafficking measures at their branded hotel, Plaintiff's trafficking would have been averted.

133.    Defendants' rooms would not have been rented for Plaintiff's victimization, and Defendants would not have profited from her pain.

## COUNT ONE – VIOLATION OF 18 U. S. C. § 1595 ("TVPRA")
### (Against All Defendants)

134.    Plaintiff incorporates each foregoing allegation in paragraphs 1-133 as though set forth fully herein.

135.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action pursuant to 18 U.S.C. § 1595.

136.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit from a venture that they knew or should have known involved sex trafficking in violation of 18 U.S.C. § 1591(a). At all relevant times, Defendants breached this duty by their participation in and facilitation of the trafficking of Plaintiff for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

137.    All Defendants have benefited as a result of their acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, Defendants directly benefited from the trafficking of Plaintiff on each occasion they received payment for rooms that she was being kept in at Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were

the but-for and proximate cause of Plaintiff's injuries and damages.

138.    As a direct and proximate cause of Defendants negligence, Plaintiff was caused to suffer physical harm, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life and loss of life's pleasures both in the past and in the future with permanent injury.

139.    Plaintiff has suffered substantial physical and psychological injuries which are permanent as a result of being trafficked at the Defendants' branded hotels in violation of 18 U.S.C. § 1591(a).

## COUNT TWO – NEGLIGENCE
### (Against All Defendants)

140.    Plaintiff incorporates each foregoing allegation in paragraphs 1-139 as though set forth fully herein.

141.    Defendants individually and/or by and through their actual or apparent agents, servants and employees, were under a duty to provide reasonable, adequate, and sufficient security personnel and/or to otherwise take appropriate steps of persons lawfully on the premises of the branded hotel.

142.    Defendants individually and/or by and through their actual or apparent agents, servants and employees knew and should have reasonably anticipated criminal conduct by third parties, including other guests, invitees or persons on the premises of the branded hotel.

143.    Defendants individually and/or by and through their actual or apparent agents, servants and employees, had a duty to take precautions against reasonably anticipated criminal conduct by third parties and to operate the branded hotel in a manner that did not endanger children or other persons,

including Plaintiff. Moreover, the Defendants had a duty of care to take reasonable steps to protect foreseeable victims of the dangers created by their acts and omissions, including the danger of human trafficking and sexual exploitation on the premises of the branded hotel.

144. Defendants individually and/or by and through their actual or apparent agents, servants and employees, breached the foregoing duties because they knew, facilitated or should have known that persons lawfully on the premises of the branded hotel, such as Plaintiff, could be victimized by, or subjected to, criminal activities on the premises that would likely endanger their health, safety, and/or well-being. Moreover, Defendants breached their duty of care because they knew, or should have known, that adults working as sex traffickers were causing, by any means, minors, including Plaintiff, to be sexually exploited and trafficked at the branded hotel on a repeated basis.

145. Defendants individually and/or by and through their actual or apparent agents, servants and employees, knew and should have reasonably anticipated that it was reasonably foreseeable from their knowledge and/or past experiences that persons on the premises of the branded hotel, including Plaintiff, would suffer serious bodily harm as a result of being victimized by violent crimes perpetrated by third parties on the premises of the branded hotel.

146. Defendants individually and/or by and through their actual or apparent agents, servants and employees, failed and/or refused to take adequate precautions to protect persons on the premises of the branded hotel, including Plaintiff, from

36

criminal and violent activities of others, despite a reasonable likelihood that person

on the premises of the branded hotel, including Plaintiff, would be victimized by,

or subjected to, such criminal and/or violent acts, which could cause such persons

serious bodily injury.  The negligence of Defendants individually and/or by and

through their actual or apparent agents, servants and employees consisted of the

following:

   a.  Failing to execute and/or implement the established security plan and/or

      execute and/or implement any established security plan;

   b.  Failure to publish and/or post orders at the security posts providing

      protocols for employees to follow in circumstances involving commercial

      sexual activity and/or human sex trafficking;

   c.  Failing to adopt, establish, implement, and/or enforce required policies,

      procedures, rules, regulations and/or guidelines concerning protection of

      individuals lawfully on the premises;

   d.  Failing to adopt, establish, implement, and/or enforce required policies,

      procedures,

   e.  Failing to adequately control access to the premises;

   f.  Failing to prevent entry of unauthorized individuals onto the premises;

   g.  Failing to properly and adequately hire, train and provide ongoing training

      to employees including but not limited to ongoing training involving

      recognizing, preventing and responding to criminal activity, prostitution and

      sex trafficking;

   h.  Failing to select and/or retain only personnel competent to provide proper

and adequate professional services;

i.  Failing to assign experienced security personnel to provide competent guard services at the branded hotel;

j.  Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning protection of business invitees on the premises of the branded hotel;

k.  Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper security measures in a hotel setting;

l.  Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper monitoring, surveillance, and patrolling of the premises;

m.  Failing to detect and respond to commercial sex activity and human sex trafficking at the branded hotel;

n.  Failing to conduct adequate surveillance of the premises of the branded hotel;

o.  Failing to utilize surveillance equipment to monitor suspicious activity and promptly react thereto for the safety of Plaintiff;

p.  Failing to respond and react to suspicious activity detected on video surveillance;

q.  Failing to maintain surveillance equipment in proper working order;

r.  Failing to test or properly test surveillance equipment to ensure it was in working order;

s.  Failing to utilize appropriate and/or required surveillance equipment;

t.  Failing to adequately monitor activity on video surveillance and promptly react thereto for the safety of Plaintiff;

u.  Allowing individuals to come on to the premises for the express purpose of trafficking Plaintiff;

v.  Facilitating the activities of a human trafficker for money;

w.  Failing to prevent Plaintiff from being trafficked on the premises;

x.  Failing to exercise care, caution, and diligence required under the circumstances;

147.    By renting rooms to Plaintiff's sex trafficker under an alias, with a fake credit card and hiding the occupancy of the Plaintiff as well as knowingly allowing her to be published online for sex from their property and facilitating the trafficking by deliberately turning a blind eye,  Defendants, individually and/or by and through their actual or apparent agents, servants and employees, breached the standard of good and prudent care by not reporting, intervening, disrupting or otherwise stopping the practice of traffickers committing commercial sex acts with a minor.

148.    As a direct and proximate cause of Defendants negligence, Plaintiff was caused to suffer physical harm, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life and loss of life's pleasures both in the past and in the future with permanent injury.

149.    As a direct and proximate cause of Defendants negligence, Defendants breached its duty to Plaintiff in not reporting, intervening, disrupting or otherwise

stopping sex trafficking occurring at the branded hotel.

150.	In addition to compensatory, consequential, and special damages, Plaintiff is entitled to punitive damages against Defendants under the same in that their actions were undertaken maliciously, willfully and with reckless or wanton disregard.

## **PRAYER OF RELIEF**

WHEREFORE, Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, jointly and severally, and that it award her damages in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

1. The process and summons issue, as provide by law, requiring Defendants to appear and Answer Plaintiff's Complaint;

2. That service be had upon Defendants as provided by law;

3. That the Court award and enter a judgement in favor of the Plaintiff and against the Defendants for compensatory and special damages in an amount that will fully compensate the Plaintiff, Monetary awards provided to Plaintiff in the sum of $300,000,000.00;

4. For punitive damages;

5. For the costs of litigating this case;

6. Plaintiff respectfully demands a jury of six (6) and reserves the right to amend this Complaint to conform to evidence as it develops;

7. All other relief, legal or equitable, that this Honorable Court deems just and proper.

Respectfully Submitted,
S.G.

40

Electronically Signed
By:/s/ *Phillip S. Georges*
Phillip S. Georges, Esq.
VSB #66596
*Attorney for Plaintiff S.G.*

**Phillip S. Georges, PLLC**
801 18th Ave. S
Nashville, TN 37203
T: 615-486-4115 x. 700
F: 615-576-8668
E: phil@wolfofjustice.com

41

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2025, I caused the foregoing document to be filed with the

Court by CM/ECF, which will send a notice of electronic filing to all counsel of record.

Ellen E. Dew, Esq. (*pro hac vice* forthcoming)
Virginia Callahan, Esq. (*pro hac vice* forthcoming)
DLA Piper LLP (US)
650 South Exeter Street, Suite 1100
Baltimore, Maryland 21202
Tel.: (410) 580-3000
Fax: (410) 580-3001
Ellen.Dew@us.dlapiper.com
Virginia.Callahan@us.dlapiper.com
*Attorneys for Defendants Marriott Hotel Services, LLC,*
*Sodexo, Inc., and Sodexo Management, Inc.*

Benjamin S. Boyd, Esq. (VSB #28427)
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
Tel.: (202) 799-4000
Fax: (202) 799-5000
Benjamin.Boyd@us.dlapiper.com

Timothy J. Lyle, Esq. (VSB #100527)
Susan Childers North, Esq. (VSB #43068
Gordon Rees Scully Mansukhaini, LLP
5425 Discovery Park Boulevard, Suite 200
Williamsburg, VA 23188
Tel.: 757-903-0870
Fax: 757-401-6770
tlyle@grsm.com
snorth@grsm.com
*Attorneys for Coastal Hospitality Associates, LLC*
*and Dunes Hotel Investment Associates, LLC*

Respectfully Submitted,
S.G.

Electronically Signed
By:/s/ *Phillip S. Georges*
Phillip S. Georges, Esq.

42

VSB #66596
*Attorney for Plaintiff S.G.*